******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# GUILLERMO BALBUENA *v.* COMMISSIONER OF CORRECTION
## (AC 45965)
## (AC 45966)

Bright, C. J., and Suarez and Clark, Js.*

*Syllabus*

The petitioner, who previously had been convicted in 2004 of sexual assault and unlawful restraint in the first case and, in 2014, of conspiracy to commit murder in the second case, appealed, on the granting of certification in each case, from the judgments of the habeas court dismissing his petition for a writ of habeas corpus in the first case and dismissing in part and denying in part his petition for a writ of habeas corpus in the second case. The petitioner claimed, inter alia, that the court improperly denied his claim of ineffective assistance of counsel in the second case. *Held*:

The habeas court properly dismissed the petition in the first case for lack of subject matter jurisdiction as the petitioner was no longer in custody on the 2004 conviction when he filed the petition, and he did not satisfy any exception to the custody requirement recognized in *Lackawanna County District Attorney* v. *Coss* (532 U.S. 394).

This court declined to review the petitioner's inadequately briefed claim that the habeas court improperly dismissed the count of the petition in the second case alleging actual innocence as to both the 2004 and 2014 convictions for failure to state a claim upon which relief could be granted.

The habeas court properly rejected the petitioner's claim, in the second case, of ineffective assistance of counsel predicated on his trial counsel's failure to investigate and present the petitioner's alibi defense, as the record demonstrated that trial counsel did investigate the petitioner's alleged alibi and the petitioner failed to demonstrate that trial counsel's strategy not to present the petitioner's alibi defense was objectively unreasonable.

The habeas court did not improperly deny the petitioner's claim, in the second case, of ineffective assistance of counsel predicated on his trial counsel's failure to confront the state's three eyewitnesses on cross-examination, as trial counsel's strategic decision not to undermine favorable evidence as to the first witness was not objectively unreasonable, the petitioner could not demonstrate that he was prejudiced by trial counsel's failure to cross-examine the second witness on specific issues because the second witness did not testify at the habeas trial, and the court reasonably concluded that cross-examining the third witness regarding her prior inconsistent statement

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

would have only served to reinforce her trial testimony that she did not see the shooting but did see the petitioner at the scene.

The petitioner's claim, in the second case, that the habeas court improperly concluded that trial counsel's failure to move to preclude the presentation to the jury of the 2004 conviction did not prejudice the petitioner necessarily failed because he failed to challenge the court's conclusion that trial counsel did not perform deficiently regarding the evidence of the petitioner's 2004 conviction and he failed to establish that he was prejudiced by trial counsel's alleged ineffectiveness in stipulating as to the existence of the 2004 conviction.

Argued October 16, 2024—officially released March 18, 2025

*Procedural History*

Amended petition, in each case, for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the court, *Oliver, J.*, granted the respondent's motion, in the first case, to dismiss the petition in its entirety and rendered judgment thereon and granted the respondent's motion, in the second case, to dismiss count one of the petition; thereafter, the court, *Oliver, J.*, granted the petition for certification to appeal in each case and the petitioner filed separate appeals to this court; subsequently, the remaining count in the second case was tried to the court, *Bhatt, J.*; judgment denying the petition in the second case; thereafter, the court, *Bhatt, J.*, granted the petition for certification to appeal the judgment of denial in the second case and the petitioner filed an amended appeal in the second case; subsequently, this court dismissed the original appeal for lack of a final judgment in the second case and granted the petitioner's motion to consolidate the appeals. *Affirmed.*

*Robert J. Sullivan, Jr.*, for the appellant in each case (petitioner).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Christian M. Watson*, state's attorney, and *Jo Anne Sulik*, senior assistant

state's attorney, for the appellee in each case (respondent).

*Opinion*

BRIGHT, C. J. These consolidated appeals arise from separate petitions for writs of habeas corpus filed by the petitioner, Guillermo Balbuena, challenging his 2004 conviction of sexual assault and unlawful restraint (amended first petition) and his 2014 conviction of conspiracy to commit murder (amended second petition). In Docket No. AC 45965, the petitioner appeals from the judgment of the habeas court dismissing his amended first petition for lack of subject matter jurisdiction, and he claims that the court improperly concluded that it lacked jurisdiction over the amended first petition because the petitioner no longer was in custody on the 2004 conviction when he filed it. In Docket No. AC 45966, the petitioner appeals from the judgment of the court dismissing in part and denying in part the amended second petition, and he claims that the court improperly (1) dismissed the actual innocence count for failure to state a claim upon which habeas relief could be granted and (2) denied the ineffective assistance of counsel count after trial. We affirm the judgments of the habeas court.

The record reveals the following undisputed facts regarding the petitioner's 2004 conviction. On March 29, 2004, the petitioner pleaded guilty to sexual assault in the third degree and unlawful restraint in the first degree. On June 10, 2004, the court imposed a total effective sentence of ten years of incarceration, execution suspended after eighteen months, followed by ten years of probation. In December, 2005, the petitioner was deported to Mexico, but he subsequently returned to the United States.

The following facts, either as found by the habeas court or as set forth by this court in the petitioner's

direct appeal from his 2014 conviction, and procedural history are relevant to our resolution of the appeal in AC 45966. "On January 8, 2011, the victim, Erick Cruz, was at his aunt's home in New Britain for a Three Kings Day celebration. While the victim and his family were celebrating, the [petitioner], his brothers Yair Balbuena [(Yair)] and Mario Balbuena [(Mario)], and three other individuals arrived at the scene in two vehicles. Upon their arrival, the [petitioner's] group began to vandalize a car belonging to the victim's brother, Mario Cruz [(Cruz)], who was also at the Three Kings Day celebration. After receiving a call from Cruz, the victim and his cousin, Marcelino Bermejo [(Marcelino)], ran downstairs and emerged from the building, whereupon they encountered the [petitioner's] group.

"The [petitioner] and his five cohorts advanced on the victim. In response to the group's advance, the victim began to back away toward a garage located behind the building and urged [Marcelino] to call the police. [Marcelino] ran back into his aunt's home to make the telephone call. . . . The group pursued the victim around a car, around the garage, and back into the street. Members of the group then shot at the victim multiple times, and one of the shots struck the victim in the neck, exiting through his jaw.

"Santa Bermejo [(Santa)], a cousin of the victim and sister of [Marcelino], was in a building across the street when she heard a gunshot. In response to the noise, she stepped onto the second floor porch and lay on her stomach where she could look through a gap between the floor and the solid railing. From her location on the porch, [Santa] was able to observe and identify the [petitioner] and his two brothers. . . . Once the [petitioner] and his cohorts fled, she went onto the street. Shortly thereafter, [Marcelino] and [Santa] found the victim lying on the ground, bleeding from his wounds. The police and ambulance arrived, and the victim was

taken to Saint Francis Hospital and Medical Center in Hartford, where he was treated for his injuries.

"The victim gave two statements to the police following the incident, one at the hospital on January 13, 2011, and one at the New Britain Police Department on May 18, 2011. On both occasions, the victim stated that the [petitioner] was one of the six individuals who had pursued him, that two of the individuals had guns, and that the [petitioner's] brother, [Mario], was the individual who had shot him. The victim was unclear as to the [petitioner's] exact role in the pursuit; on January 13, 2011, the victim identified the [petitioner] as the other individual with a gun, while on May 18, 2011, the victim was uncertain if the [petitioner] had a gun.

"The [petitioner] was arrested on October 3, 2012, and charged with attempt to commit murder . . . conspiracy to commit murder . . . assault in the first degree . . . and criminal possession of a firearm . . . ." (Footnote omitted.) *State* v. *Balbuena*, 168 Conn. App. 194, 196–98, 144 A.3d 540, cert. denied, 323 Conn. 936, 151 A.3d 384 (2016). The petitioner was represented by Attorney Dennis McMahon throughout the criminal proceedings. Because the existence of a prior felony conviction is a necessary element of the criminal possession of a firearm offense, McMahon agreed to submit a stipulation to the jury that the petitioner previously was convicted of an unnamed felony to avoid evidence regarding the 2004 conviction of sexual assault. Specifically, at the criminal trial, the parties stipulated that the petitioner "was previously convicted of a felony on March 29, 2004."

After a jury trial, "the [petitioner] was convicted of conspiracy to commit murder and acquitted of all other charges. The court subsequently denied the [petitioner's] motion for a judgment of acquittal and sentenced the [petitioner] to eleven years [of] incarceration." *State*

v. *Balbuena*, supra, 168 Conn. App. 198. This court affirmed the petitioner's conviction on direct appeal, concluding that "the jury reasonably could have found that the evidence established beyond a reasonable doubt that the [petitioner] was guilty of conspiracy to commit murder." Id., 207. We reasoned that "[t]he jury had sufficient evidence to support the reasonable inference that it was not mere coincidence that the [petitioner] and his cohorts arrived on the scene together and vandalized the car of the victim's brother. Moreover, upon seeing the victim, the group, armed with guns and knives, began to advance on, and subsequently to pursue, the victim. . . . Members of the group taunted the victim, stating, 'how does it feel to have a pistol in your face?' and that they were going to kill him. . . . Accordingly . . . a jury reasonably could have found that taunting the victim that they were going to kill him and advancing on the victim with weapons in hand indicated that the [petitioner] and his cohorts agreed to kill the victim. Furthermore, even if the [petitioner] was not armed with a gun while he and his group pursued the victim, testimony reveals that the group's weapons, two of which were guns, were visible during the pursuit. The jury thus reasonably could have inferred that the [petitioner] was aware that some of his cohorts were armed and intended to use their weapons." (Citations omitted.) Id., 203–204.

On April 21, 2017, the petitioner filed the underlying habeas petitions, and he filed the operative amended petitions in January, 2022. In the amended first petition, he alleged that he is actually innocent as to the 2004 conviction (count one) and that his 2004 guilty plea was the product of ineffective assistance of counsel (count two). In the amended second petition, the petitioner alleged that he is actually innocent as to both the 2004 and 2014 convictions (count one) and that McMahon provided ineffective assistance in connection

with the 2014 conviction (count two). In support of his actual innocence claims, the petitioner alleged that the victim in the 2004 sexual assault case recanted[1] and that the recantation was newly discovered evidence that was not available at the time of either his guilty plea in 2004 or the trial in 2014.

The respondent, the Commissioner of Correction, moved to dismiss the amended first petition for lack of subject matter jurisdiction, arguing that the petitioner was no longer in custody on the challenged 2004 conviction when he filed the amended first petition. The petitioner filed a memorandum in opposition to the respondent's motion to dismiss, arguing that he "is physically incarcerated on the 2014 case. His 2004 wrongful conviction not only enhanced his sentence in the 2014 case, it actively contributed to the finding of guilt that produced it. Even if the 2004 wrongful conviction had enhanced his sentence without contributing to guilt, the petitioner is 'in custody' as contemplated by [*Lackawanna County District Attorney* v. *Coss*, 532 U.S. 394, 121 S. Ct. 1567, 149 L. Ed. 2d 608 (2001)]." In addition, the petitioner argued that he satisfied "an exception [to the custody requirement] for cases in which 'no channel of review was actually available to a defendant with respect to a prior conviction, due to no fault of his own.' [*Daniels* v. *United States*, 532 U.S. 374, 383, 121 S. Ct. 1578, 149 L. Ed. 2d 590 (2001)]."

The respondent also moved to dismiss count one of the amended second petition for failure to state a claim on which habeas relief could be granted. In a supporting

---

[1] Specifically, the petitioner alleged that, in 2015, the victim in the sexual assault case recanted and committed the recantation to writing in a statement obtained by an investigator engaged by the petitioner's counsel. We note that, although the petitioner referred to the recantation throughout the proceedings before the habeas court, the recantation was neither offered by the petitioner nor admitted into evidence at trial.

memorandum of law, the respondent argued that the petitioner's allegations that he was wrongly convicted of crimes in 2004 and that evidence of that conviction was wrongfully admitted at his 2014 trial failed "to raise a cognizable claim of actual innocence—i.e., they do not support a finding that the petitioner has newly discovered evidence that he did not participate in the [shooting] of [the victim] . . . ." The petitioner filed a memorandum in opposition to the respondent's motion to dismiss, arguing that "the 2015 recantation is newly discovered evidence in both the 2004 and 2014 cases. The cases are inextricably intertwined. . . . It is reasonable to conclude, therefore, that elimination of the enormous negative impact of this prior conviction would have caused an already skeptical jury to fully acquit [the petitioner]."

On September 9, 2022, the habeas court, *Oliver, J.*, granted the motions to dismiss pursuant to Practice Book § 23-29 (1) and (2).[2] The court dismissed the amended first petition pursuant to § 23-29 (1), concluding that it lacked subject matter jurisdiction over the petition because "the petitioner was not in custody, at the time of filing, for the challenged 2004 [conviction]." The court dismissed count one of the amended second petition pursuant to § 23-29 (2), concluding that it failed to "assert a cognizable claim of actual innocence as it does not claim or support a finding of newly discovered evidence." The court granted the petitions for certification to appeal, and these appeals followed.[3]

---

[2] Practice Book § 23-29 provides in relevant part: "The judicial authority may, at any time, upon its own motion or upon motion of the respondent, dismiss the petition, or any count thereof, if it determines that:

"(1) the court lacks jurisdiction;

"(2) the petition, or a count thereof, fails to state a claim upon which habeas corpus relief can be granted . . . ."

[3] After filing these appeals, the petitioner filed in the habeas court a motion pursuant to Practice Book § 61-4, seeking a written determination that the issues resolved by the dismissal of count one of his amended second petition were of such significance to the determination of the outcome of the case

Thereafter, the court, *Bhatt, J.*, held a trial on count two of the amended second petition, in which the petitioner alleged that McMahon provided ineffective assistance of counsel in connection with his 2014 conviction. Specifically, the petitioner alleged that McMahon performed deficiently by failing (1) to investigate and present an alibi defense that the petitioner was with his brother Yair at a gas station at the time of the shooting, (2) "to confront, effectively or at all, critical purported eye/ear witnesses . . . who provided [prior inconsistent] statements," and (3) "to keep out the fact of the petitioner's [2004] conviction." At trial, the petitioner called several witnesses to testify in support of the petition, including himself, his brothers, Yair and Mario, and his sister, Rocio Balbuena (Rocio). The petitioner also presented testimony from McMahon and his investigator, Diane Kalinowski; Silvia Gutierrez, the mother of the petitioner's child; Porfiria Cardoso (Porfiria), a family friend of the petitioner; Saleem Siddique, the owner of the gas station where the petitioner claimed to have been on the night of the shooting; and Dan Markle, habeas counsel's investigator.

The parties filed their posttrial briefs and reply briefs in May, 2023, and the court issued a memorandum of decision denying the amended second petition on May 31, 2023. The court rejected the petitioner's ineffective assistance of counsel claims, concluding that the petitioner failed to prove either that McMahon performed deficiently in any respect or that he was prejudiced by any of the alleged deficiencies. Upon the granting of his petition for certification, the petitioner amended his appeal in AC 45966 to challenge the final judgment on the amended second petition.[4] He subsequently filed a

that the delay incident to the appeal would be justified. The court, *Oliver, J.*, denied the motion.

[4] On May 25, 2023, this court ordered the parties to file memoranda addressing whether the petitioner's appeal in AC 45966 from the judgment dismissing count one of the amended second petition should be dismissed for lack of a final judgment because count two remained pending in the

motion to consolidate the appeals in AC 45965 and AC 45966, as amended, which this court granted on July 25, 2023. Additional facts and procedural history will be set forth as necessary.

I

In AC 45965, the petitioner claims that the court improperly concluded that it lacked jurisdiction over the amended first petition because the petitioner was no longer in custody on the 2004 conviction when he filed it. The petitioner does not dispute that his sentence for the 2004 conviction had expired completely by the time that he filed the amended first petition. Instead, he contends that he satisfies an exception to the custody requirement first recognized in *Lackawanna County District Attorney* v. *Coss*, supra, 532 U.S. 394, because the state relied on the allegedly invalid 2004 conviction at his 2014 trial. The respondent contends that the court properly dismissed the amended first petition because it challenged only the expired 2004 conviction.[5] We con-

habeas court. On June 28, 2023, after receiving the parties' responsive memoranda and after the petitioner amended his appeal, this court dismissed the original appeal for lack of a final judgment but noted that "[t]he amended appeal filed on June 28, 2023, may proceed." See Practice Book § 61-9 ("[i]f the original appeal is dismissed for lack of jurisdiction, any amended appeal shall remain pending if it was filed from a judgment or order from which an original appeal properly could have been filed").

[5] In his appellate brief, the respondent initially claimed that AC 45965 is moot because "there is no dispute that, by virtue of the [amended second] petition filed in AC 45966, the petitioner properly alleged that he was ultimately seeking relief in that petition from the judgment of conviction in his 2014 conspiracy case, albeit by making a subsidiary challenge to the lawfulness of his 2004 conviction, and that this petition corrected any jurisdictional defect that existed in his other petition."

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates this court's subject matter jurisdiction. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *Samsel* v. *Parks*, 228 Conn. App. 583, 587, 325 A.3d 334 (2024).

clude that the habeas court properly dismissed the amended first petition for lack of subject matter jurisdiction.

Before addressing the petitioner's arguments, we set forth the applicable standard of review and relevant legal principles. "General Statutes § 52-466 (a) (1) provides in relevant part that '[a]n application for a writ of habeas corpus . . . shall be made to the superior court, or to a judge thereof, for the judicial district in which the person whose custody is in question is claimed to be illegally confined or deprived of such person's liberty.' It is well established that, for a court to have jurisdiction to entertain a habeas petition seeking to challenge the legality of a criminal conviction, the petitioner must be in the custody of the respondent *as the result of that conviction* at the time that the petition is filed." (Emphasis in original.) *Goguen* v. *Commissioner of Correction*, 341 Conn. 508, 528, 267 A.3d 831 (2021). Both our Supreme Court and this court "consistently [have] construed the custody requirement in § 52-466 to require a petitioner [to] be in custody on the conviction under attack at the time the habeas petition is filed, and that the collateral consequences of an expired conviction, such as deportation, are insufficient to render a petitioner in custody within the meaning of the statute." (Footnote omitted; internal quotation marks omitted.) *Jobe* v. *Commissioner of Correction*,

During oral argument before this court, however, the respondent's counsel abandoned the mootness claim, explaining that, upon further reflection, it became apparent to the respondent's counsel that the petitioner ultimately sought relief only as to the expired 2004 conviction in the amended first petition. By contrast, the petitioner sought relief only as to the 2014 conviction in the amended second petition. Thus, because AC 45965 concerns the only case in which the petitioner sought relief from the 2004 conviction, the respondent's counsel acknowledged, and we agree, that there remains a meaningful dispute as to whether the habeas court had jurisdiction to vacate the expired 2004 conviction as requested in the amended first petition. Accordingly, the petitioner's appeal in AC 45965 is not moot.

334 Conn. 636, 653, 224 A.3d 147 (2020); see also *Foote* v. *Commissioner of Correction*, 170 Conn. App. 747, 754–55, 155 A.3d 823, cert. denied, 325 Conn. 902, 155 A.3d 1271 (2017).

"[W]hether the petitioner is in custody for purposes of a habeas petition implicates the habeas court's subject matter jurisdiction." *Pentland* v. *Commissioner of Correction*, 200 Conn. App. 296, 302, 238 A.3d 778, cert. denied, 335 Conn. 973, 241 A.3d 129 (2020). A determination regarding a habeas court's subject matter jurisdiction is a question of law over which we exercise plenary review. See id. "[T]he interpretation of pleadings is always a question of law for the court . . . . Our review of the [habeas] court's interpretation of the pleadings therefore [also] is plenary. . . . [T]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he [petition] must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the [petition] is insufficient to allow recovery." (Emphasis omitted; internal quotation marks omitted.) *Woods* v. *Commissioner of Correction*, 197 Conn. App. 597, 607, 232 A.3d 63 (2020), appeal dismissed, 341 Conn. 506, 267 A.3d 193 (2021) (certification improvidently granted).

On appeal, the petitioner argues that he was in custody on the 2014 conviction when he filed the amended first petition and that "[h]is 2004 wrongful conviction not only enhanced his sentence in the 2014 case, it contributed to the finding of guilt that produced it. Even if the 2004 wrongful conviction had enhanced his sentence without contributing to guilt, the petitioner

was 'in custody' as contemplated by *Lackawanna* [*County District Attorney* v. *Coss*, supra, 532 U.S. 394]. Moreover, the United States Supreme Court has also provided an exception for cases in which 'no channel of review was actually available to a defendant with respect to a prior conviction, due to no fault of his own.' *Daniels* v. *United States*, [supra, 532 U.S. 374]. . . . He did not receive the victim's recantation until 2015, after his 2014 conviction, which is now inextricably intertwined with the 2004 conviction." Neither argument is persuasive.

"In *Lackawanna County District Attorney* v. *Coss*, supra, 532 U.S. 394, the United States Supreme Court held that, if a conviction that is no longer subject to direct or collateral attack 'is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a [habeas] petition . . . on the ground that the prior conviction was unconstitutionally obtained.' Id., 403–404. The court recognized three exceptions to this general rule for cases in which 'the prior conviction [that was] used to enhance the sentence was obtained [when] there was a failure to appoint counsel in violation of the [s]ixth [a]mendment'; id., 404; the petitioner '[cannot] be faulted for failing to obtain timely review of a constitutional claim'; id., 405; and the petitioner obtains 'compelling evidence that he is actually innocent of the crime for which he was convicted, and which he could not have uncovered in a timely manner.' Id. The court observed that, '[i]n such situations, a habeas petition *directed at the enhanced sentence* may effectively be the first and only forum available for review of the prior conviction.' . . . Id., 406.

"Thus, the court in *Lackawanna County District Attorney* 'merely . . . consider[ed] the extent to which *the* [*prior expired*] *conviction itself* may be subject to challenge *in the attack* [*on*] *the* [*current*] *senten*[*ce*]

which it was used to enhance.' . . . The court in *Lack-awanna County District Attorney* did *not* permit the filing against a government official who no longer has custody of the petitioner of a habeas petition that directly and solely challenges the conviction for which the petitioner is no longer serving the sentence." (Citations omitted; emphasis in original.) *Goguen* v. *Commissioner of Correction*, supra, 341 Conn. 528–29.

In the present case, both counts of the amended first petition challenged only the expired 2004 conviction. In count one of the amended first petition, the petitioner alleged that he is actually innocent of the 2004 conviction and that he "was compelled to enter a guilty plea based on the false allegation that he had committed sexual assault . . . ." In count two, he alleged that his guilty "plea was the product of ineffective assistance of counsel." Furthermore, in paragraph 7, he alleged that "he entered a plea of guilty to sexual assault . . . and unlawful restraint . . . . On June 10, 2004, conviction entered (*subject conviction*)." (Emphasis added.) As relief, the petitioner asked that the 2004 conviction be vacated. Although he requested that he be immediately released from custody, he did not request that the 2014 conviction be vacated.[6]

By contrast, in the amended second petition, which also was pending before the court when it dismissed

---

[6] The petitioner further alleged that he "is also subject to sentencing for the federal crime of reentering the country following the deportation which was promulgated by the underlying sexual assault conviction. . . . [S]aid federal crime would not have been chargeable against him but for the sexual assault conviction of which he is not guilty. . . . [U]pon completion of [his] current sentence and any such sentence imposed by the federal court, he will, again, be deported, with the mandate that he never return to the United States. . . . The petitioner alleges that all of these sentences, penalties, restrictions, and requirements are direct products of the [2004] conviction." As previously noted in this opinion, collateral immigration consequences of an expired sentence are insufficient to meet the custody requirement necessary for a court to have jurisdiction over a habeas corpus petition. See *Jobe* v. *Commissioner of Correction*, supra, 334 Conn. 653.

the amended first petition, the petitioner specifically challenged the 2014 conviction in both counts of that petition. In particular, the first paragraph provided that the petitioner "hereby challenges his [2014] conviction . . . ." In count one, the petitioner again alleged that he is actually innocent of the 2004 conviction but also that he was actually innocent of the 2014 conviction. In count two, the petitioner alleged that the 2014 conviction was the product of the ineffective assistance of McMahon. Because the petitioner ultimately challenged the 2014 conviction in accordance with *Lackawanna County District Attorney* in count one of the amended second petition, the respondent did not move to dismiss that count on the ground that the petitioner was not in custody on the 2004 conviction.

Considering the allegations in the amended first petition referring to the 2004 conviction as the "subject conviction" together with the allegations in count one of the amended second petition, which included the same actual innocence claim as to the 2004 conviction but ultimately challenged the petitioner's 2014 conviction, the amended first petition cannot reasonably be construed as attacking the 2014 conviction. We therefore conclude that the court properly construed the petition as challenging only the 2004 conviction. Consequently, because the amended first petition challenged only the expired 2004 conviction, the habeas court properly rejected the petitioner's reliance on *Lackawanna County District Attorney* and dismissed the petition for lack of subject matter jurisdiction. See *Ajadi* v. *Commissioner of Correction*, 280 Conn. 514, 547–48, 911 A.2d 712 (2006) ("[T]he petitioner does not challenge his current federal custody, but, rather, challenges his expired . . . convictions directly. Accordingly, *Lackawanna County District Attorney* has no bearing on the petitioner's claim." (Footnote omitted.)); *Lebron* v. *Commissioner of Correction*, 274 Conn. 507, 528, 876

A.2d 1178 (2005) ("[b]ecause the habeas petition in the present matter does not attack the petitioner's current, allegedly enhanced sentence, but instead attacks the petitioner's expired conviction directly . . . *Lacka-wanna County District Attorney* has no bearing on the petitioner's claim" (citation omitted)).[7]

## II

In AC 45966, the petitioner claims that the court improperly (1) dismissed the actual innocence count for failure to state a claim upon which habeas relief could be granted and (2) denied the ineffective assistance of counsel count after trial. We address each claim in turn.

## A

The petitioner first claims that the court, *Oliver, J.*, improperly dismissed count one of the amended second petition alleging actual innocence as to both the 2004 and 2014 convictions for failure to state a claim upon which relief could be granted. We decline to review this claim due to an inadequate brief.

As previously noted in this opinion, the respondent moved to dismiss count one of the amended second petition because those allegations "do not support a finding that the petitioner has newly discovered evidence that he did not participate in the [shooting] of [the victim] . . . ." During oral argument on the motion, the respondent's counsel argued that "saying that evidence was erroneously admitted at your trial does not state a claim of innocence. And because there are no facts that would support such a claim, we're moving to dismiss that count." In response, the petitioner's counsel

---

[7] Finally, because the petitioner was able to seek review of his expired 2004 conviction as part of his challenge to the 2014 conviction in the amended second petition pursuant to *Lackawanna County District Attorney*, we reject his argument that " 'no channel of review was actually available' " to him as to the 2004 conviction.

argued that "count one really adds a significant component to what count two alleges, which is that the state had the opportunity to argue the prior conviction and did so very vigorously in the 2014 case. They argued it four separate times, and the closing arguments ended with [it being] a very big part of the claim they made. There were four counts charged in the 2014 case. The jury acquitted on three counts, only convicted on one count, and they asked for readback of the testimony of all three . . . eyewitnesses. It was a very weak case to begin with. Now, if you'd add that on top of that, the state should not have had the ability to introduce the prior conviction, which we are challenging in the [amended first petition], the—we think it's overwhelming evidence of innocence [that] has been properly alleged." The habeas court rejected the petitioner's arguments and granted the motion to dismiss count one because it failed to "assert a cognizable claim of actual innocence as it does not claim or support a finding of newly discovered evidence."

On appeal, the petitioner notes that the court dismissed count one of the amended second petition on the ground that "the recantation was not newly discovered evidence *as to the 2014 conviction* . . . ." (Emphasis added.) In his principal appellate brief, however, the petitioner neither discusses the legal standard for newly discovered evidence of actual innocence nor explains how the alleged recantation of the victim in the 2004 sexual assault case demonstrates his factual innocence as to the 2014 conviction. Given the absence of any argument in this regard, the respondent contends that the petitioner's purported challenge to the judgment dismissing count one of the amended second petition is inadequately briefed and, therefore, we should decline to consider the issue. The respondent also argues, in the alternative, that the court properly dismissed count one because "[n]one of the petitioner's

allegations . . . constituted 'affirmative proof that the petitioner did not commit the crime' of *conspiracy*" and, therefore, count one fails "to state a legally sufficient claim that [the petitioner] is actually innocent of the [2014] conviction . . . ." (Emphasis in original.)

In his reply brief, the petitioner argues that he "extensively briefed" the dismissal of count one and the application of the principle set forth in *Lackawanna County District Attorney* v. *Coss*, supra, 532 U.S. 394. We are unpersuaded and decline to review the petitioner's purported challenge to the court's dismissal of count one of the amended second petition due to an inadequate brief.

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [When] a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned. . . . For a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Internal quotation marks omitted.) *Reiner* v. *Reiner*, 214 Conn. App. 63, 84–85, 279 A.3d 788 (2022).

During oral argument before this court, counsel for the petitioner maintained that count one of the amended second petition alleged that the petitioner is actually innocent of both the 2004 and 2014 convictions. In the statement of issues in his principal appellate brief, the petitioner states: "Is the recantation of the victim in a 2004 sex[ual] assault conviction, which did not exist until after the 2004 sex[ual] assault conviction [had]

been used prejudicially against him to obtain a conviction in a 2014 shooting case, 'newly discovered evidence' for habeas purposes, when the 2004 sex[ual] assault conviction is challenged through a habeas challenging the 2014 shooting conviction, as contemplated by *Lackawanna* [*County District Attorney*]?" In the argument section of his brief, however, the petitioner never discusses the legal sufficiency of his actual innocence claim as to the 2014 conviction. Instead, he focuses exclusively on the issue of whether he was in custody on the 2004 conviction and the application of *Lackawanna County District Attorney* v. *Coss*, supra, 532 U.S. 394. Although the petitioner argues that *Lackawanna County District Attorney* applies to both of the court's rulings, that case has no bearing on the legal sufficiency of an actual innocence claim as to the 2014 conviction. Thus, because the petitioner failed to address the legal sufficiency of his actual innocence claim as to the 2014 conviction, any purported challenge to the dismissal of count one of the amended second petition is inadequately briefed.[8]

---

[8] Moreover, when questioned during oral argument before this court, the petitioner's counsel conceded that the petitioner cannot state a legally sufficient claim of factual innocence as to the 2014 conviction by tying the alleged recantation by the victim in the 2004 case to the 2014 conviction. Counsel nevertheless argued that he hoped to develop "new standards," though he failed to articulate the parameters of his desired standard. Given counsel's concession, even if we were to review the court's dismissal of count one of the amended second petition, the petitioner's challenge necessarily would fail.

The victim's alleged recantation in the 2004 case, even if fully credited, is insufficient as a matter of law to establish the petitioner's factual innocence as to the 2014 conviction. Indeed, the gravamen of the petitioner's actual innocence claim is that the jury would have acquitted him of all of the charges if the state had not been able to inform the jury that the petitioner had a prior, unnamed felony conviction. In other words, he claims that, without the evidence regarding his 2004 conviction, there was insufficient evidence to prove his guilt beyond a reasonable doubt. At most, such a claim raises only legal innocence and does little more than cast "doubt on evidence presented at [the 2014] trial" and, therefore, fails to state a legally sufficient claim of actual innocence as to the 2014 conviction. (Internal quotation marks omitted.) *Ross* v. *Commissioner of Correction*, 217 Conn.

B

The petitioner also claims that the court, *Bhatt, J.*, improperly denied the ineffective assistance of counsel claims in count two of the amended second petition. More specifically, he claims that the court improperly concluded that (1) McMahon did not perform deficiently by failing (a) to investigate and present the petitioner's alibi defense and (b) to confront the state's three eyewitnesses regarding their prior inconsistent statements, and (2) McMahon's failure to move to preclude the presentation to the jury of the 2004 conviction did not prejudice the petitioner. The following additional facts, as found by the court, are relevant to our resolution of the petitioner's ineffective assistance of counsel claims.

In its memorandum of decision, the court set forth the following additional facts regarding the petitioner's ineffective assistance of counsel claims. "[The victim] testified at the criminal trial that on the night of the shooting, he was at a party at . . . 76 Putnam Street [in New Britain]. . . . [H]is brother [Cruz] alerted [Marcelino] that someone was hitting Marcelino's car. Marcelino, [Cruz] and [the victim] went downstairs to investigate. When he went downstairs, he saw Mario, Gregorio Cid (Gregorio), Roberto Cardoso (Roberto), Silvers Arenas (Arenas), and Yair at a store at the intersection of Putnam and Oak Streets. He did not see [the petitioner] there. The other group saw [the victim] and [approached] him. [The victim] told Marcelino to call the police. He walked around the back of the building but was followed by the men who said they were going to kill him . . . .

"He heard eight shots. While being fired at, Marcelino was standing near the entrance to his aunt's building.

<hr>

App. 286, 295–96, 288 A.3d 1055, cert. denied, 346 Conn. 915, 290 A.3d 374 (2023). Accordingly, the court properly dismissed count one of the amended second petition pursuant to Practice Book § 23-29 (2).

[The victim] was hit and went to the hospital. He remained in the hospital for two weeks and underwent surgeries. Shortly after the incident, while he was still in the hospital, officers came to speak to him [with] a Spanish speaking officer who served as a translator. Since he could not speak comfortably, he wrote out his responses on paper during that interview. However, he testified that he did not understand much of what was being asked of him.

"On May 18, 2011, a few months after he was discharged from the hospital, he again spoke to officers at the New Britain Police Department and provided a second statement. He was accompanied to the police department by [Santa], who translated for [the victim] from Spanish to English. In his statement, he told [the police that] the individuals involved with shooting him were [the petitioner], Yair, Mario, Arenas, Gregorio, and Roberto and [that] they were associated with the gang Vato Locos. He told the police that even though they were from the same place in Mexico, he believed that the Vato Locos apparently did not like him because he refused to join their gang. In that statement he said that Arenas, [Roberto] and Gregorio had knives in their hand and Yair had a pistol. He accused Yair and Mario of shooting at him five or six times. He thought [the petitioner] had a gun but could not be sure that [the petitioner] was holding something. [At the criminal trial], he reiterated that Mario and Yair shot him but testified that [the petitioner] was not present.

"Sometime before the criminal trial, he met with and gave a statement to [McMahon's] investigator in which he stated that [the petitioner] was not present during the shooting. He was asked about this statement during his testimony at the criminal trial and denied being threatened by anyone to change his testimony. He testified that during the first statement to the police, he was on a lot of pain medication and was 'unconscious,' and

the second time he spoke to the police he told them [the petitioner] was not there. He reiterated [at trial] that [the petitioner] did not shoot him and was [not] present at the scene. . . .

"Santa, sister of Armando Bermejo (Armando) and Marcelino and cousin to [the victim] and [Cruz], provided a statement to an Officer Banos at the scene of the incident. She told [Banos] that she saw [the petitioner] shoot [the victim] and that Mario, Roberto, Arenas and Gregorio were also involved. She stated that all the males involved had guns. According to her, Gregorio was outside yelling at [Cruz] until his father came out and dragged him into their house. She told [Banos] that Mario, [the petitioner], and Arenas left in three separate vehicles.

"Santa then provided a statement to the police on January 9, 2011. In that statement she told the police that she was at home when she heard a loud gunshot. She went to her porch and looked outside and saw Marcelino, [the victim], and a 'group of five guys'— Mario, Yair, [the petitioner], Roberto, and Gregorio—of whom [the petitioner], Yair, and Roberto were holding guns. Contrary to [the victim's] version, she did not identify Arenas as being part of the group. The five [men] were yelling, asking for the whereabouts of Armando. She 'ducked down' and saw [the petitioner] raise his right arm and shoot [the victim] one time with a black gun. [The victim] fell to the ground, while Yair and Roberto were pointing their guns around to keep others at bay. All of them returned to their vehicles and drove off. She saw Gregorio's father grab him and pull him into their house. . . .

"On March 8, 2014, she was interviewed by [McMahon's] investigators. When they spoke to her, she repeated that she saw Mario and [the petitioner] at the scene but stated that she did not see the shooting. She gave

the impression that she was 'making up her story as she went along' and did not want to get involved, thinking the case was already over.

"She testified at the criminal trial that she was . . . at the party on the night of the shooting. She heard one shot and went to the porch of her aunt's house. She lay down on the porch and from a three inch slat at the bottom of the porch she saw Yair, Mario, [the petitioner], [Roberto] and [Gregorio]. She did not identify Arenas as being present. In her statement to the police, she identified [the petitioner], Yair and Roberto with guns. She stated that she saw [the petitioner] shoot [the victim] but did not state that Mario shot at [the victim]. After the three of them left, she went downstairs and found [the victim] unconscious. She saw them leave in a car.

"On cross-examination, she testified that her vantage point for seeing the incident was a slat at the bottom of the porch and she was lying on her stomach to be able to see what was happening across the street from her. . . .

"On January 8, 2011, Marcelino was approached by [Banos] at the scene of the incident. She asked him if he knew who shot [the victim], but he did not answer. Marcelino then later approached an Officer Halt . . . and was transported to the police department to provide information. He told [Halt] that he was attending a family party when 'three to five' vehicles pulled up. Mario, Yair, Roberto and [the petitioner] got out of the vehicles and started [to] ask him where Armando was. He believed that because Armando had shot someone known to the men, they were looking for him. Marcelino told them he did not know. At that point, [the victim] and others came outside. Mario and [the petitioner] then took out guns, and [the victim] pushed Marcelino out of the way. He then heard gunshots but was unsure

of how many. [The victim] yelled he was shot, and Marcelino ran inside a building to call 911. He handed his phone to someone and ran back outside to [the victim's] aid. [The victim] told him that Mario and [the petitioner] shot him. Marcelino believed that Gregorio had set him up and that he was the intended target of the shooting. He told officers that Mario, Yair and [the petitioner] were part of the Vato Locos gang.

"That same night, a Detective Webster also took a statement from Marcelino. In it, he explained that he was getting ready to leave his uncle's house when Mario and [the petitioner] 'pulled up with a bunch of people.' There were 'three car loads of people,' including Mario and [the petitioner]. According to Marcelino, the men started demanding to know the whereabouts of Armando. He then heard a gunshot, and [the victim] pushed him to the side and told him to call the cops. He grabbed a doorknob and slipped on the floor. He crawled up the stairs back to his uncle's apartment. While crawling, he heard three or four more shots. He called 911 and then went back downstairs. [The victim] told him that Mario and [the petitioner] shot him. [Marcelino] did not see Mario or [the petitioner] with a gun but believed that [the victim] may have seen them with guns.

"[At the criminal trial] Marcelino testified that he was at the party at his aunt's house on the night of the shooting. He was outside the building with his cousin [Cruz] when he saw two cars with people arrive. In those cars were [Mario], [the petitioner], and others. It happened very fast, it was snowing and he heard gunshots. He tried to run up the stairs but fell, and during that time, [the victim] was shot. He called the cops while running back down the stairs and saw [the victim] on the ground bleeding. He testified that [Mario], [the petitioner], and the others ran away. He testified that [the victim] told him [Mario] shot him and [that the victim] mumbled something else that he did not

hear. He was impeached by the state with his own statement to the police in which he said that [the victim] also identified Memo, known to be [the petitioner]. On cross-examination, Marcelino testified that he did not see the shooting. . . .

"[Cruz] spoke to [Banos] and [Webster] and provided a statement. He told them that while he was sitting inside his uncle's vehicle, he was approached by Gregorio and Arenas, who began to hit the vehicle. Gregorio opened the driver's side door and began to punch him and tried pulling him out of the car. Arenas also punched him in the face. . . .

"[Webster] testified at the criminal trial that he was tasked with interviewing Marcelino and [Cruz] and also prepared photographic arrays to show [Cruz]. [Cruz] was able to identify [Mario] and Arenas from two separate photographic arrays but was unable to identify [the petitioner] from a third [array]. . . .

"Sergeant Gray testified at the criminal trial that, when he interviewed [the victim], [the victim] affirmatively communicated that [the petitioner] shot him. Through him, the state introduced portions of [the victim's] two statements to the police as substantive evidence. In both those statements, he identified [the petitioner] as being present. . . .

"Gregorio was not called to testify at the criminal trial or the habeas trial. On March 7, 2014, [McMahon's] investigator spoke to Gregorio. Gregorio told her that on the night of the incident he was hanging out with Arenas and Mario at Mario's residence. He was very drunk, so Mario and Arenas accompanied him home. At the scene, Mario and Arenas began to fight with [Cruz] and [the victim]. . . . Gregorio told the investigator that [the petitioner] was not there. He was extremely intoxicated and did not hear any gunshots. The investigator determined that Gregorio's statement

did not match up with Arenas', so she did not take a statement from him. . . .

"Dario Cid, [Gregorio's] father, was questioned by the police on the night of the incident. He told them that he was sleeping when his wife woke him up to tell him that Gregorio was outside fighting. He went out and dragged Gregorio back in[side]. Then he went back to sleep. His wife woke him up again an hour later and said that she heard a bang outside. He was not called as a witness at either . . . trial but provided a statement to [McMahon's] investigator on May 1, 2013. In that statement, he said that [Porfiria] came to his house to tell him that Gregorio was fighting with [Cruz]. He went outside and pulled Gregorio into his house just before he heard gunshots. He told the investigator that he was certain that [the petitioner] was not present. . . .

"Arenas was not called to testify at either the criminal trial or the habeas trial but provided a statement to [McMahon's] investigator on February 27, 2014. In that statement, he recounted that, on the night of the incident, he was drinking at Mario's house with Mario and Gregorio. They went to drop Gregorio off at his house. [Arenas] left Mario's car to walk to a nearby convenience store. While in the store, he heard up to two gunshots. A few minutes later, Mario came into the store and together they left quickly and went to Mario's house. There, Mario confessed to shooting [the victim]. Arenas then went to [the petitioner's] house to tell him what happened. [The petitioner] and Arenas returned to Mario's house, and Arenas was driven home by them. In his statement, [Arenas] stated that [the petitioner] was not present for the shooting. . . .

"Mario was charged with the shooting of [the victim], as was Yair. He was convicted of that crime. Shortly

after the shooting, he was arrested by the police. Initially, on January 14, 2011, he invoked his rights and refused to speak to the police until after he had spoken to an attorney . . . . On January 16, 2011, Mario asked to speak to [Gray]. He waived his rights and provided a statement to the police. He told them that he shot [the victim] and that Yair and [the petitioner] had nothing to do with the shooting. He said that he changed his mind while being held in the cellblock . . . .

"Mario told the police that over the summer his cousin Kevin Mejia [(Kevin)] had been shot by Armando as retaliation for a fight Kevin had with [the victim]. On the night of January 8, 2011, Mario and Gregorio were at Mario's house drinking and since his car was dead, he decided to walk Gregorio back to his house. He had a nine millimeter black handgun in his pocket because he was afraid of Armando, who had been threatening his family. As he approached the scene, he saw Marcelino and [the victim] along with their family members. Mario believed that Armando was there as well and became afraid that he was going to get jumped. Gregorio got into a fight with [Cruz] and Mario pulled out the gun for safety. According to Mario, neither Yair nor [the petitioner] were there. He believed [the victim] was running to get a gun, so he followed [the victim] and pointed his gun at [him]. According to Mario, everyone was yelling, and he was drunk, so he felt threatened and shot at [the victim] in the shoulder. He shot only once. He then shot one time into the air to scare others away before running off.

"The next day, the police again spoke to Mario to get his consent to search his vehicle. He provided consent. They asked him if he could contact [the petitioner]. . . . Mario offered to speak to Yair to get that number. Mario and Yair called [the petitioner], who said he was in New York and would turn himself in. Yair then also volunteered to speak to the police.

"Mario spoke to [McMahon's] investigator and provided a written statement on April 17, 2013. In that statement, he repeated what he told the police. He added that he was with Roberto, Arenas and Gregorio, but his brothers Yair and [the petitioner] were not present but rather at their mother's house.

"Mario was repeatedly identified as a defense witness during trial by [McMahon]. [McMahon] asked the court to ensure that Mario was transported to court to testify. At the time the court took a recess shortly before lunch, Mario was anticipated to testify following the recess. However, when court reconvened after the lunch recess, [McMahon] stated 'as I told [the prosecutor] during the break, and I've told this to my client as well, we do not intend to put on a case. We are not going to call the brother.' [The petitioner] was also not called as a witness and the court canvassed him on his decision not to testify.

"Mario testified at the habeas trial that he shot [the victim] and [that neither the petitioner nor Yair] was . . . present at the time of shooting . . . . [He further testified that] [n]either [the petitioner] nor Yair had anything to do with the shooting. Mario testified that, on the night of the shooting, he was having drinks with his cousin Gregorio at Mario's house. Mario's car was not working that night so he and his cousin walked home together. Gregorio was intoxicated and that was one reason why Mario was walking Gregorio home, to ensure he reached there safely. On the way to Gregorio's house, which was next to the scene of the shooting, he saw a group of guys with whom he had prior confrontations when a family member of Mario had been shot by that rival group a few months prior. He did not know that they lived in the building. Mario believed that at this point, Gregorio was either entering his house or in his house. He recognized them to be Armando, [the victim] and [the victim's] brother [Cruz]. He believed

that Armando had been the one who shot his family member. They surrounded him and they started to threaten him. They were threatening to go after Mario and his family members next. There were about five people on the street. Mario panicked. He saw [Cruz] go to a car and believed they were grabbing something from the car. He was afraid for his safety and shot [the victim]. He shot [the victim] and let out two more shots in the air to prevent anyone else from jumping him. He then left the scene and ran to the back of a building with a big yard. He was scared so he started jumping fences and ran across streets until he felt far enough away to be safe from there. He dropped the gun while running. He then ended up at a friend's house.

"He was arrested a few days later and initially refused to speak to the police. He told them that he had spoken to his lawyer and would not be speaking to them. However, sometime later that day, the police arrested Yair and placed him in a cell near Mario. The two of them talked while being held at the police department. Mario then volunteered to speak to the police and told them that he did the shooting and that his brother was not involved. He was aware that his brothers could be deported if they were convicted. He provided this information to the police and told them that [the petitioner] and Yair were not present at the scene. At the time [Mario] gave his statement to the police, [the petitioner] had not been arrested for the incident. However, the police did not believe him because [the petitioner] and Yair continued to be prosecuted.

"Mario entered a guilty plea because he knew he was guilty and admitted that guilt. He knew that [the petitioner] was going to trial and volunteered to be a witness at [the petitioner's] trial. During [the petitioner's] defense investigation, Mario . . . told [McMahon's] investigator that he was prepared to testify that

[the petitioner] was not present at the scene and provided a written statement to that investigator.

"Mario was transported to court to testify pursuant to arrangements made by [McMahon]. [McMahon] went to see Mario at the prison to talk to him about his potential testimony. He also spoke to Mario at the courthouse. At all times when [McMahon] spoke to Mario, Mario had been sentenced for the charges arising from [the 2014 shooting]. Mario was willing to testify but during his conversation with [McMahon], he felt that [McMahon] believed he was lying and expressed that Mario could be charged with perjury if he was lying. Mario was never called as a witness despite being ready to testify for [the petitioner].

"Arenas is [Mario's] former brother-in-law. [Mario] did not recall if Arenas was present during the confrontation. Mario knows Roberto but did not recall if [he] was present during the confrontation. However, in his statement to the police, he told them that Arenas, [Roberto], and Gregorio were there with him during the confrontation. He recalled that Gregorio came back out of his house and got into a confrontation with [Cruz]. He also recalled Gregorio's father coming out to drag Gregorio back into their house. . . .

"Yair is the brother of [the petitioner] and Mario. He speaks and understands very little English. He was arrested and charged with the shooting of [the victim] but testified at the habeas trial that he did not shoot [the victim] and was not present when [the victim] was shot but instead was at a gas station with [the petitioner].

"He spoke to the police before and after he was arrested. When they first came looking for him, he initially did not want to speak to them before speaking to his lawyer. However, he then voluntarily spoke to them. During that interrogation, he told them the above

recitation of his whereabouts that night. He was then arrested and provided another statement to the police reiterating the above. When he gave his statement to the police, he was not aware that Mario had confessed to shooting [the victim]. He indicated that the bank records would corroborate his story. He volunteered to take a lie detector test. The police did not ask for the records and did not provide him with a lie detector test despite asking him if he was willing to take one. He turned over two phones to the police and provided them with his mother's telephone number. He invited them to call his mother to confirm that he was telling the truth about his whereabouts.

"On April 9, 2013, [Yair] was interviewed by [McMahon's] investigator while incarcerated. He provided a written statement, in which he repeated what he told the police: that he was with [the petitioner] at a gas station at the time of the shooting and both of them were not present for [the] shooting. In that statement, he also told the investigator that the gas station records would show that he and [the petitioner] were filling gas at the time of the shooting. He was not called to testify at the criminal trial.

"On February 24, 2014, [McMahon's] investigator once again spoke to Yair. His story remained exactly the same, so she did not take another statement from him.

"Yair testified at the habeas trial that when [the victim] was shot, [Yair] was on his way from [the petitioner's] home to his own home. He received a call from [the petitioner] who wanted to come over for dinner. He got up and went to get [the petitioner] in his van. He went to his [brothers'] house on Kelsey Street. He picked up [the petitioner] and started driving back. On the way back they stopped at a gas station to get gas. The gas station was on East Main and Stanley Street. He put . . . $30 [or] $40 [of] gas in the van using a

debit card from Webster Bank. He shared the account with Elizabeth Mejia, the mother of his children. Both of them had cards in their respective names.

"When locked up at the police station, he was in a cell near his brother Mario. They did not get together to come up with a story absolving him and [the petitioner] but did talk about why they were arrested.

"He ultimately [pleaded] guilty based on the advice of his attorney, wanting to take advantage of the plea agreement. He [did so] because his attorney only spoke to him in English and told him it was the only thing left to do. He was aware that [the petitioner] had also been arrested for this incident. He would have testified at [the petitioner's] trial that [the petitioner] was not guilty. Yair did not recall being approached by [McMahon] or his investigator. Nobody approached him to ask him if he was willing to testify, but he would have done so. When he was sentenced, [the petitioner] had not yet been arrested. . . .

"Rocio is the sister of Mario, Yair and [the petitioner]. She testified at the habeas trial that she is familiar with the area where [the victim] was shot, having lived in New Britain for twenty-three years. She would have helped her brothers with their legal troubles in this case, if called upon to do so. She provided [the petitioner's] habeas attorney with the Webster Bank debit card that was admitted as an exhibit in this case. Prior to [the petitioner's criminal] trial, no one asked her to assist in tracking down and obtaining the Webster Bank debit card. . . .

"Gutierrez is the mother of [the petitioner's] child. She testified at the habeas trial that [the victim] is a cousin of her sister's husband. . . . She spoke to an investigator for [the petitioner] and [said] that she texted [the victim] after she found out [about the shooting] and told him to tell the truth. [The victim] told her

that he had already said that [the petitioner] was not present and instead that Mario and some others were present. She told the investigator that [the victim] conveyed to her that 'Goyo' and 'Neno' or 'Nene' were present and shot him. She did not know their real names but knew that 'Goyo' is [the petitioner's] cousin. She [testified that she] was not contacted by an investigator again, nor was she called to testify at the [criminal] trial.

"[McMahon's] investigator's notes, however, reveal that she made several attempts to locate and contact Gutierrez. She spoke to Gutierrez on October 28, 2013, and in that phone call Gutierrez told the investigator that she was dating [the victim] around October, 2012. At that time, [the victim] told her that [the petitioner] had nothing to do with him getting shot. She explained that she had not come forward earlier because she was not aware that [the petitioner] was charged with shooting [the victim] and instead believed that he was in jail for immigration purposes.

"On November 14, 2013, [McMahon] asked his investigator to get a statement from Gutierrez. Over the course of seven dates between November 15 and December 6, 2013, the investigator left several messages for Gutierrez but did not receive a call back. She informed [McMahon] of this via a letter dated December 6, 2013.

\* \* \*

"[Porfiria] lived in the vicinity of the location of the shooting. She knew [the victim] from the neighborhood. She was going from her house toward a store near the scene of the shooting but did not make it there. There was police presence that prevented her from going to the store. She learned that there was a shooting so she could not go further. She heard an individual on the street screaming that Memo—identified as [the petitioner]—did it, but the individual did not specify what Memo was alleged to have done. She then returned

home and called [the petitioner] to tell him what she had heard. [The petitioner] did not know what she was talking about. [The petitioner] told her that [he] was at home. He appeared calm on the phone but expressed surprise at being accused of the shooting. She did not speak to any private investigator at the time of the trial. She did speak to [the petitioner's] current investigator, [Markle].

"[McMahon's] investigator made several attempts to speak to Porfiria in May and June, 2013. The investigator enlisted the help of [the petitioner's] sister, Rocio, in attempting to make contact with Porfiria but ultimately was unsuccessful. . . .

"The Webster Bank records showing that [the petitioner] was at the gas station were not admitted as exhibits in the habeas trial. No phone records were admitted either. Any surveillance footage was also not available due to the passage of time and, thus, was not admitted as an exhibit in the habeas trial. . . .

"[The petitioner's] primary language is Spanish. He is not a United States citizen and hails from Mexico. . . . He moved to New Britain in 2000 [or 2001], when he was about fifteen years old. He went to high school in New Britain. As a result of a prior conviction, he was deported. He eventually returned to the [United States] and lived in New Britain with his family, including his mother.

"[The petitioner] had seen [the victim] before the shooting but did not have contact with him. He testified that he did not shoot [the victim] and was not in [the victim's] vicinity on the night of the shooting. He was at his house with his brothers Yair [and] Mario, his cousin Gregorio and some others. They were all drinking together. He went to sleep after drinking some beers. He woke up hungry and saw that there was nobody in the house. He called his mother to ask her to make him

something to eat. Yair was living with his mother at that time. His mother asked Yair to pick [the petitioner] up and bring him to her house for dinner. Yair and [the petitioner] stopped at a gas station on their way to their mother's house. This was at the same time that the shooting occurred. He received a call from [Porfiria] who told him that his brother had shot [the victim] and [that] he was also being accused of it. He heard sirens from patrol cars driving by. [The petitioner] explained to Yair that Mario had shot [the victim] and that he had also been accused of shooting [the victim]. In that moment he panicked that he was going to be arrested and deported again. They continued to their mother's house and [the petitioner] explained what he knew to his mother.

"Panicked, he left Connecticut and went to the Bronx. He remained there for one year but returned to New Britain to be with his family and support them. During that year, he heard that Mario and Yair had been convicted for the shooting of [the victim]. Five or six months later, he was arrested. . . .

"During the pendency of his criminal case, his grasp of the English language was very weak. [McMahon] visited him approximately four times at the jail and met with him at the courthouse. There was no interpreter present at any of their meetings in jail. [The petitioner] did not recall speaking to him on the phone. Up until the time of trial, none of his conversations with [McMahon] were assisted by a Spanish speaking interpreter. At trial, there was an interpreter present. He wrote several letters to [McMahon] explaining his lack of understanding of English. Some of the letters were written with the assistance of other incarcerated individuals who wrote and spoke English. [McMahon] did not respond to these letters.

"During the pendency of [the criminal] case, [McMahon] did not share any police reports with him. Prior

to the trial, he was aware that [Santa], Marcelino, and [the victim] were accusing him of shooting [the victim] along with Mario. He was aware that they claimed that he and Mario went to the scene demanding to see Armando. He knew the state's theory revolved around retaliation for Armando shooting [Kevin] a few months before this incident. [The petitioner] was present when Armando shot [Kevin]. He spoke to the police about this incident but did not want to due to his immigration concerns. [McMahon] asked him about this incident, and [the petitioner] told him the [foregoing information].

"According to [the petitioner], he attempted to speak to [McMahon] about this case, but [McMahon] would instead repeatedly refer to his prior sexual assault case. [McMahon] kept stating that since he owed five years on probation for the prior case, he should take a five year offer in this case. [The petitioner] repeatedly told [McMahon] that he was innocent. He told [McMahon] he wanted to testify at trial that he was innocent of the shooting. [McMahon] told him that it was not convenient because his brother Mario had already lied and was protecting him and Yair so that is why Mario [pleaded] guilty. [The petitioner] believed that [McMahon] thought Mario was lying about who was at the scene. [The petitioner] told [McMahon] that Mario had admitted to shooting [the victim] alone and [the petitioner] was not present. [The petitioner] testified that he got the impression that [McMahon] did not believe him. He and [McMahon] discussed whether to call witnesses to support his alibi defense. [McMahon] told him they would need witnesses, but they were never called to testify. During [the criminal] trial, he believed that Mario would be called to testify, but on the same day Mario was supposed to, [the petitioner] learned that Mario was not going to be called. [McMahon] did not have any discussions with him about investigating the

presence of surveillance cameras at the gas station or attempting to secure receipts of his pumping gas.

"[The petitioner] also maintained his innocence in the prior sexual assault case. He did not know why that was mentioned during his criminal trial and had expressed his innocence to [McMahon], telling him that he could speak to the complainant in that case to confirm. The state made several offers to resolve the case but [the petitioner] rejected them all because he was innocent. . . .

"[McMahon] represented [the petitioner] from the end of 2012 through trial. He met with [the petitioner] numerous times both at the jail and in court. According to [McMahon], [the petitioner] communicated with him in English and his English was 'good.' [McMahon] received discovery from the state and hired an investigator. The investigator spoke to several witnesses, and [McMahon] told her to follow all leads. The investigator would then report back to [McMahon] about the results of the investigation.

"During their conversations, [the petitioner] told [McMahon] that he was not involved in the shooting and provided three different explanations for his whereabouts. First, [he said] that he was driving to New York with a friend named Guillermo, for whom he had no contact information. Second, he said that he did not recall where he was. Third, he said he and his brother were together going somewhere. [The petitioner] did tell [McMahon] that he was at a gas station with his brother. [McMahon] investigated this by having his investigator speak to possible witnesses to corroborate this, but he did not speak to any witnesses himself. [McMahon] did speak to Mario and Yair. He did not recall whether he asked his investigator to go to the gas station to try and obtain records or any other evidence to show that [the petitioner] was at the gas station at the time of the shooting.

"[McMahon] did not recall [the petitioner] telling him that [the petitioner] received a phone call from Porfiria telling [the petitioner] that he was accused of shooting [the victim]. [McMahon] had some issues with [the petitioner's] alibi. The witnesses were not consistent—they were not cooperating and 'everyone was giving different stories.' He thought the alibi was weak. His investigator reported that the stories did not match up and the witnesses were not cooperating with them. He could not recall which witnesses were investigated, however. He also was unaware of the use of the Webster Bank debit card used to pay for gas.

"[The petitioner] did not testify at [his criminal] trial. He made the decision not to testify based on the manner in which the state's evidence was presented. [McMahon] agreed with this decision and recommended that he not take the stand. [McMahon] was able to keep gang references out of the case and believed that if [the petitioner] had taken the stand, it would have opened the door to that testimony. He did not pressure [the petitioner] to forgo his right to testify and [the petitioner] was free to testify if he wanted to. Based on their discussions, [McMahon] did not believe that [the petitioner] would testify well on the stand [and] that his testimony would not have helped their case, because his story changed on multiple occasions and there was the specter of the involvement of gangs.

"[McMahon] thought that the state's evidence was not very strong and was favorable to the defense. There was some harmful evidence, but he believed he was able to demonstrate those witnesses' lack of credibility.

"[McMahon] and [the petitioner] spoke about [the petitioner's] prior sexual assault conviction. [The petitioner] denied committing that crime. [McMahon] did not investigate the veracity of his claim or those prior allegations."

Before turning to the petitioner's specific claims, we set forth the well settled standard of review for ineffective assistance of counsel claims. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . In a habeas trial, the court is the trier of fact and, thus, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony . . . . It is simply not the role of this court on appeal to second-guess credibility determinations made by the habeas court. . . .

"[I]t is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . .

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . .

"It is axiomatic that courts may decide against a petitioner on either prong [of the *Strickland* test], whichever is easier. . . . [T]he petitioner's failure to prove either [the performance prong or the prejudice prong] is fatal to a habeas petition. . . . [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [petitioner] as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (Citations omitted; internal quotation marks omitted.) *Mercer* v. *Commissioner of Correction*, 222 Conn. App. 713, 722–23, 306 A.3d 1073 (2023), cert. denied, 348 Conn. 953, 309 A.3d 303 (2024).

1

The petitioner first claims that the court improperly denied his ineffective assistance of counsel claim predicated on McMahon's failure to investigate and present the petitioner's alibi defense. We disagree.

In its memorandum of decision, the court concluded that "there is no deficient performance with regard to any claim relating to the failure to investigate or present an alibi defense." As to McMahon's alleged failure to pursue the gas station records and the bank records identified by the petitioner and Yair, the court concluded that "[a]ny claim as to the failure to present corroborating records must . . . be denied because this court was not presented with the bank records or gas station records demonstrating that Yair and [the petitioner] were there at the time of the shooting." The court also concluded that the evidence established that McMahon did investigate the petitioner's alibi. The court found that Kalinowski, McMahon's investigator, "spoke to Mario, Yair, and Gutierrez and obtained statements from them and unsuccessfully attempted to speak to Gutierrez again and also could not contact

Porfiria." The court further concluded that McMahon made a reasonable tactical decision not to present an alibi defense, reasoning that "McMahon had Mario's statement[s] to the police and his investigator and had spoken to him personally. Mario testified that [McMahon] told him that he did not believe him. [McMahon] testified that he decided not to put on an alibi defense because the stories of the witnesses were different from one another and some, like Gutierrez and Porfiria, were nonresponsive. This assessment is validated by the inconsistencies in the testimon[y] of [the petitioner], Yair, and Porfiria. . . .

"The court notes the circumstances surrounding the arrest[s] of Mario and Yair and how they eventually decided to speak to the police. This could have been used to impeach them with the implication that Mario decided to take sole responsibility. Yair also [pleaded] guilty to being involved in [the conspiracy] offense and the court does not have the transcript of his guilty plea and sentencing and thus is unable to determine what his role was alleged and acknowledged to have been. . . . [A]t the time of [the petitioner's criminal] trial, Yair had already been sentenced and thus, his supposed testimony that he and [the petitioner] were elsewhere at the time of the shooting would have been severely undermined by the fact that he had admitted involvement in the shooting. Further, there are significant inconsistencies between the statements of Yair and [the petitioner] as to their whereabouts at the time of the shooting and when they discovered that they were implicated in it. . . . There is no independent corroborating evidence that [the petitioner] was not present during the shooting: only the testimony of Mario, Yair, and [the petitioner]. Thus, any claim pertaining to the failure to investigate and present the testimony of alibi witnesses is also denied as lacking proof."

Notwithstanding its conclusion that the petitioner failed to satisfy *Strickland*'s performance prong, the court also determined that "there is no prejudice stemming from any alleged deficient performance. There was ample evidence from which the jury could conclude as it did—that [the petitioner] did not shoot [the victim] but was present for the shooting. All of the inconsistencies in the witnesses' statements were put before the jury, who asked for playback of critical testimony. [The victim] himself testified that [the petitioner] was not present for the shooting. Despite this, the jury concluded that [the petitioner] conspired to shoot [the victim]. Given the credibility problems with the alleged alibi testimony, the court is not convinced that had [McMahon] called Mario, Yair or any of the other alibi witnesses to testify, the outcome of the trial would have been different. The jury clearly believed that [the petitioner] was present but did not shoot [the victim] and there is no reasonable likelihood that the outcome would have been different."

On appeal, the petitioner argues that "[a]libi and third-party culprit defenses[9] were available to trial counsel when the case began. . . . [The gas] station owner [Siddique] was available and would have provided corroborative video and transaction records. Porfiria confirmed making the telephone call to [the petitioner]. Rocio confirmed the existence of the Webster Bank cards which were specifically identified to the police

---

[9] Although the petitioner also claims that McMahon was deficient in failing to investigate and present a "third-party culprit" defense, he fails to present any meaningful argument in that regard. Moreover, as the respondent correctly notes in his appellate brief, "the offense of conspiracy—the only offense for which the petitioner stands convicted as a result of this incident—does not exclude the possibility of other guilty parties. . . . Thus, the fact that others might also be guilty of participating in the conspiracy would not exclude the possibility that the petitioner also was guilty of participating in it, an inference essential to showing a defendant's innocence in the usual situation of a third-party culpability defense."

in the police reports, corroborated by Yair's diagram and his willingness to take a lie detector test. . . . In this extremely weak case in which the jury acquitted on three of the four counts, without having been presented with the plausible alternative described herein, a full acquittal is a reasonable expectation." (Footnote added.) We are not persuaded.

First, the habeas court properly rejected the petitioner's claims related to the gas station records and Webster Bank card on the ground that the petitioner failed to introduce those records to demonstrate that the petitioner and Yair were at the gas station at the time of the shooting. Indeed, without demonstrating that the records supported the petitioner's claimed alibi, he cannot establish that he was prejudiced by the alleged failure to pursue those records. See, e.g., *Shaheer* v. *Commissioner of Correction*, 207 Conn. App. 449, 472, 262 A.3d 152 ("this court will not second-guess defense counsel's decision not to . . . investigate potential defenses . . . when . . . the petitioner fails to present, at the habeas hearing, evidence . . . that he argues counsel reasonably should have discovered during the pretrial investigation" (internal quotation marks omitted)), cert. denied, 340 Conn. 903, 263 A.3d 388 (2021).

Second, because the evidence establishes that McMahon investigated the petitioner's alibi, the habeas court properly concluded that McMahon did not perform deficiently in failing to do so. See *Roberto A.* v. *Commissioner of Correction*, 229 Conn. App. 104, 115, 325 A.3d 1192 (duty to investigate defendant's alibi defense requires that counsel "make all reasonable efforts to identify and interview potential alibi witnesses" (internal quotation marks omitted)), cert. denied, 350 Conn. 935, 327 A.3d 384 (2024). The evidence admitted at the habeas trial confirms McMahon's testimony that he investigated the petitioner's alibi defense but rejected it as weak. The excerpts from Kalinowski's investigative

report reflect that she obtained written statements from several witnesses, including the petitioner, Mario, Yair, and the victim, and documented the various attempts that she made to speak with and obtain statements from Porfiria and Gutierrez.[10] Although McMahon testified that he did not recall the petitioner mentioning Porfiria's phone call, Kalinowski's notes confirm that she was unable to obtain Porfiria's statement despite several attempts and that it appeared that Porfiria did not want to get involved in the matter. Similarly, although Kalinowski was able to speak with Gutierrez on October 28, 2013, Kalinowski informed McMahon in a letter dated December 6, 2013, that she had "made several attempts on several days to contact [Guiterrez]. To this date she has not returned any of my phone calls." Accordingly, because the record demonstrates that McMahon investigated the petitioner's alleged alibi, the court properly rejected the petitioner's claim to the contrary.

The petitioner's claim that McMahon was deficient in failing to present the alibi defense is likewise unavailing. "Our review of an attorney's performance is especially deferential when his or her decisions are the result of relevant strategic analysis. . . . Thus, [a]s a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken. . . .

"[T]he presentation of testimonial evidence is a matter of trial strategy. . . . Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of a witness and that the attorney . . . without adequate explanation . . . failed to call the witness at trial. . . .

[10] At the habeas trial, the court admitted into evidence portions of Kalinowski's report and supplement thereto, which included several of the written statements Kalinowski obtained from the various witnesses and her notes regarding the investigation.

Furthermore, [t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. . . .

"[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, such as when . . . counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . . Thus, an attorney's choice to pursue a defense that focuses on casting doubt on the state's case rather than on calling his or her own witnesses can be a reasonable choice. . . . To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." (Citation omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 166 Conn. App. 95, 140– 41, 140 A.3d 1087 (2016), aff'd, 330 Conn. 520, 198 A.3d 52 (2019).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." (Internal quotation marks omitted.) *Roman* v. *Commissioner of Correction*, 229 Conn. App. 219, 225, 325 A.3d 1208 (2024).

At the habeas trial, McMahon discussed his reasoning for declining to present the petitioner's alibi defense: "I've done, in my career, about a half a dozen alibis and they've all been rock solid. They've all done very well. Two of them I've taken to trial, and I've done well with them but they were always very consistent. In this case, nobody was consistent. Everybody was not cooperating. They were telling different stories. I thought that

the—an alibi defense was weak and I told him that. . . . [M]y investigator said that . . . everybody was telling different stories. Everybody didn't want to speak with her. She had to track them down. They were not cooperating, and a lot of the stories just did not match up. And I found that unless an alibi is on all fours, it's just not something that should be advanced at trial." He later added that he "did not think the alibi was strong. I just did not, especially when he said to me three different things as to where he was, finally landing on the gas station thing with his brother. I find that when you have an alibi, your story never changes. It's what it is on day one and it is [the same] on day 101." At trial, rather than presenting the "weak" alibi defense, McMahon focused on "what the state had put in and not put in." He explained: "I had argued that the witnesses were all not credible. I argued that there was substantial physical evidence that had been removed from the scene, which would've compromised the results of the investigation and that the main thing was that the victim himself did not put my client at the scene."

The petitioner has failed to demonstrate that McMahon's strategy was objectively unreasonable. To the contrary, the evidence presented at the habeas trial demonstrates that McMahon made a reasonable strategic decision after a full investigation. The transcripts from the 2014 trial reflect that, in each count of the long form substitute information, the state alleged that the shooting of the victim occurred on January 8, 2011, "at approximately 10:36 p.m." in the vicinity of 76 Oak Street in New Britain. In their statements to Kalinowski in 2013, both the petitioner and Yair stated that Yair picked up the petitioner at 236 Kelsey Street around 9 or 9:30 p.m. on the night of the shooting and that, on their way back to 110 Winter Street, they stopped for gas at a gas station on the corner of Stanley Street and

East Main Street.[11] They both stated that they stayed at 110 Winter Street for a few hours before the petitioner left to go to a friend's house.

There are several issues with the petitioner's alibi that support McMahon's decision not to pursue such a defense. This was the third purported alibi offered by the petitioner, and the primary alibi witness was his brother, Yair. In addition, given that the time required to drive from Kelsey Street to Winter Street is approximately six minutes and that 110 Winter Street is only a few blocks from the scene of the shooting,[12] the petitioner's alleged alibi placed the petitioner within minutes

[11] Specifically, Kalinowski noted that, on April 9, 2013, she obtained a statement from the petitioner in which he stated that Yair "picked him up around [9 p.m.]" on the night of the shooting, that he and Yair "went and got gas for the car," and that Yair "used his debit card so there should be a record. He said they then went to [Yair's] house to eat. He said they were there for a few hours. [The petitioner] then said that a friend of his, [Porfiria] called his cell to tell him that there was a shooting and people were blaming [the petitioner]. At that time, [the petitioner] said he left to go to a friend's house."

Kalinowski also obtained a written statement from Yair on April 9, 2013, in which Yair similarly provided that he "picked [the petitioner] up around 9 or 9:30 p.m. [They] stopped to get gas at a gas station across the street from the Army recruitment office. I think it was a Citgo station. I filled up the gas tank with my Webster Bank [d]ebit [c]ard. My baby's mama was also on the account so she might have the records. After we filled the tank up, we went to my apartment to eat. [The petitioner] was there with me and our mom for a few hours. After a few hours a friend of [the petitioner's] picked [the petitioner] up and brought him back to his apartment. I found out about the shooting the next day. My Uncle Dario Cid called me to tell me that my brother Mario was involved. [The petitioner and I] were at my mother's the night this happened. We were not part of this crime. We were not even there."

[12] At the habeas trial, Yair testified that, at the time of the shooting, he was living at his mother's house located at 110 Winter Street in New Britain and that the petitioner was living with their brother Mario at 236 Kelsey Street. Both Yair and the petitioner testified that 110 Winter Street is only three or four blocks from where the shooting occurred on Oak Street, and Mario testified that it would have taken approximately thirty or forty minutes to walk from Kelsey Street to Oak Street. Although there is no evidence in the record regarding the specific distances between the relevant locations or the time required to drive from one location to the other, we take judicial

of the scene of the shooting around the time that the shooting occurred. Leaving aside that Yair is the petitioner's brother, McMahon also had reason to doubt the strength of Yair's proposed testimony that neither he nor the petitioner were present for the shooting in light of Yair's guilty plea to conspiracy to commit assault in connection with the shooting of the victim. Equally problematic for the petitioner's alibi defense was the fact that, although the victim had recanted his prior statements in which he had identified the petitioner as being present at the scene of the crime with a gun, he maintained that Yair was present for the shooting. Consistent with that statement, the victim testified at the criminal trial that he saw Mario, Arenas, Roberto, Yair, and Gregorio immediately before being shot. Thus, the petitioner's alibi was inconsistent with the favorable testimony from the victim, which McMahon specifically highlighted as "the main thing" for the defense.

Given the victim's testimony placing Yair at the scene of the shooting and considering Yair's guilty plea to a conspiracy charge for his role in the shooting, we cannot conclude that McMahon's decision to forgo the petitioner's alleged alibi defense and to focus instead on the weaknesses in the state's case was objectively unreasonable. Indeed, electing not to advance an alibi defense predicated on the petitioner being with an admitted coconspirator at the time of the shooting reflects sound professional judgment. See *Johnson* v.

notice that the distance between 236 Kelsey Street and 110 Winter Street via Stanley Street is approximately 1.6 miles and the approximate driving time is six minutes. See Google Maps (2025), available at https://www.google.com/maps/dir/110+Winter+St,+New+Britain,+CT+06051/ 236+Kelsey+St,+New+Britain,+CT+06051/ (last visited February 28, 2025); see also, e.g., *Horn* v. *Commissioner of Correction*, 321 Conn. 767, 786 n.15, 138 A.3d 908 (2016) (because parties "cited no evidence in the record regarding the time required to drive from Bridgeport to New Haven," Supreme Court took judicial notice of distance and driving time between cities in considering petitioner's failure to adequately investigate claim).

*Commissioner of Correction*, supra, 166 Conn. App. 141–42 ("The petitioner failed to demonstrate that defense counsel's general strategy to keep the jury's focus on weaknesses in the state's case, instead of diverting focus to an alibi defense, was unreasonable under the circumstances. This is particularly true in light of the weakness in the state's case following [the eyewitness'] recantation. Moreover, even if the petitioner could demonstrate that such a general strategic decision was unreasonable, in the present case, defense counsel raised many reasonable concerns about the overall strength of the alibi evidence, including its potential to benefit the state's case by placing the petitioner near the scene of the crime at the time that it was committed."). Therefore, the habeas court properly rejected the petitioner's ineffective assistance of counsel claim predicated on McMahon's alleged failure to present the petitioner's alibi defense.

2

The petitioner next claims that the court improperly denied his ineffective assistance of counsel claim predicated on McMahon's failure "to confront the state's three witnesses with significant glaring falsehoods directly relating to [the petitioner's] absence from the scene." We disagree.

The following legal principles are relevant to the petitioner's claim. It is well settled that "[o]nce an attorney makes an informed, strategic decision regarding how to cross-examine a witness, that decision is virtually unchallengeable. . . . An attorney's line of questioning on examination of a witness clearly is tactical in nature. [As such, this] court will not, in hindsight, second-guess counsel's trial strategy. . . . The fact that counsel arguably could have inquired more deeply into certain areas, or failed to inquire at all into areas of claimed importance, falls short of establishing deficient performance."

(Internal quotation marks omitted.) *Mercer* v. *Commissioner of Correction*, supra, 222 Conn. App. 746.

"It is axiomatic that a habeas petitioner who claims prejudice based on counsel's alleged failure to present helpful evidence from a particular witness, must call that witness to testify before the habeas court or otherwise prove what the witness would or could have stated had he been questioned at trial, as the petitioner claims he should have been." (Internal quotation marks omitted.) *Jones* v. *Commissioner of Correction*, 212 Conn. App. 117, 131–32, 274 A.3d 237, cert. denied, 343 Conn. 933, 276 A.3d 975 (2022); see also *Benitez* v. *Commissioner of Correction*, 197 Conn. App. 344, 350–51, 231 A.3d 1285 (petitioner failed to prove prejudice because he "failed to call the complainant to testify at the habeas trial, or otherwise to establish what the complainant would or could have testified to on cross-examination, had he been questioned" in manner proposed by petitioner), cert. denied, 335 Conn. 924, 233 A.3d 1091 (2020); *Taft* v. *Commissioner of Correction*, 159 Conn. App. 537, 555–56, 124 A.3d 1 (petitioner failed to prove prejudice because he failed to offer evidence as to how witness would have testified if they had been cross-examined differently), cert. denied, 320 Conn. 910, 128 A.3d 954 (2015).

In rejecting the petitioner's claim in the present case, the court reasoned as follows. "McMahon's investigator obtained a statement from [the victim] in which [he] stated that [the petitioner] was not present during the shooting. [The victim] testified in accordance with that but was impeached with his prior [inconsistent] statements to the police. There is no deficient performance as to [the victim].

"[McMahon's] investigator also spoke to Santa and obtained a statement in which she stated that she saw [the petitioner] at the scene but, contrary to her prior

statements, did not see him shoot [the victim]. On cross-examination, [McMahon] elicited that she went out to the porch and saw [the petitioner] *after* she heard one shot. This is consistent with her statement to his investigator that she saw [the petitioner] there but did not see the shooting.

"Marcelino testified that [the victim] told him that Mario and [the petitioner] had shot him and [McMahon] elicited on cross-examination that Marcelino did not see the shooting himself. However, Marcelino did see [the petitioner] at the scene. [The petitioner] points out numerous other areas of cross-examination that [McMahon] could have asked about. However, there is no one way to engage in cross-examination and [McMahon] exercised reasonably competent professional judgment in conducting his examination at this trial. Additionally, neither Santa, Marcelino, nor [the victim] were called to testify at the habeas trial and, thus, this court cannot determine how they would have responded to the areas of cross-examination [McMahon] could have differently inquired about.

"[McMahon] was ultimately successful in obtaining acquittals on three of the four counts. There were several witnesses who placed [the petitioner] at the scene of the crime—except, notably, the victim—and there was sufficient evidence from which the jury could conclude that [the petitioner] was physically present but did not shoot [the victim]. Even if [McMahon] could have impeached Santa with her statement to his investigator, it would have only served to reinforce her trial testimony that she did not see the shooting but did see [the petitioner] at the scene." (Emphasis in original.) Accordingly, the court concluded that the petitioner failed to prove his ineffective assistance of counsel claim predicated on McMahon's failure to adequately cross-examine the state's eyewitnesses.

On appeal, the petitioner argues that "[n]one of the time spent by trial counsel questioning the state's witnesses could reasonably be described as 'confrontation.' None of the witnesses' numerous falsehoods, inconsistencies, and version changes about who was present, who was holding firearms, and who fired was addressed. It was particularly prejudicial as the impeachment material did not just demonstrate lack of credibility—it went straight to the heart of [the petitioner's] alibi defense. . . . No conceivable strategy could explain trial counsel's failure to point out to the jury Marcelino's admission to the police that he had lied the last time he had spoken with them, his admitted motive and bias for lying previously, his claimed motive and bias for purportedly telling the truth that night, and Santa's complete reversal about having seen the shooting." He further argues that McMahon's failure to adequately cross-examine the witnesses prejudiced him because "the only evidence directly connecting the petitioner to the attack was the eyewitness testimony of Marcelino and Santa, both of whom were subject to substantial impeachment evidence." (Emphasis omitted.) We are not persuaded.

As an initial matter, we note that, despite the petitioner's claim that McMahon performed deficiently in cross-examining the victim, he fails to present any meaningful argument in support of that claim. Regardless, because McMahon testified at the habeas trial that he did not want to impeach the victim's testimony for the obvious reason that the victim denied that the petitioner was present at the scene of the crime, any claim predicated on the failure to cross-examine the victim necessarily fails. Our conclusion that McMahon's strategic decision not to undermine favorable evidence was not objectively unreasonable requires no elaboration.

As to Marcelino, the petitioner highlights various inconsistencies between Halt's report recounting Marcelino's statements on the night of the shooting and

Marcelino's written statement from that same night. He argues that those documents were "filled with significant material for confrontation on cross-examination." Specifically, he contends that Marcelino contradicted himself regarding: "which brothers [were] there"; "having seen Mario and [the petitioner] with guns"; "the sequence of the gunshots, what type of gun was used, and which building he entered [when he called 911]"; and the alleged motive for the shooting.[13]

According to the petitioner, Marcelino "should have been effectively challenged by competent counsel on the reason, if any, for running upstairs to call 911 on a cell phone he had with him downstairs, then leaving his phone upstairs and coming back down. He should have been cross-examined on how he is suddenly able to answer the question 'what kind of gun was used' because [the victim] told him, when [the victim] was reportedly unable to speak. Another fair question is why he would make the peculiar telephone call to the police [in which he] stated that he witnessed the shooting [but failed to provide any more information]." (Internal quotation marks omitted.)

The petitioner's proposed line of questioning fails to demonstrate that McMahon performed deficiently. Despite the noted inconsistencies, Marcelino consistently identified the petitioner as being present at the

---

[13] The petitioner notes that Marcelino: (1) admitted to the police that he had not been truthful in October, 2010, when he was questioned about the shooting of the petitioner's cousin Kevin; (2) initially told Halt that " 'they wanted to shoot me, not my cousin' " (referring to the victim) and then later, in his written statement, stated that the victim was shot as retaliation for Armando shooting Kevin; (3) initially claimed that Mario, the petitioner, and Yair demanded to see Armando but then, in his written statement, no longer claimed that Yair was with Mario and the petitioner; (4) claimed that the victim told him that Mario and the petitioner had shot him despite evidence establishing that the victim was unable to speak after being shot due to the damage to his face and jaw; and (5) initially claimed that he saw Mario with a gun but later denied that he saw anyone with a gun.

scene of the shooting in both statements and at trial. Marcelino testified at the criminal trial that, although he did not see the shooting, he saw Mario *and the petitioner* approach the victim immediately before the shooting occurred. Considering Marcelino's consistency on this key point—that he saw the petitioner approach the victim immediately before the shooting— it would have been reasonable for McMahon to elect not to focus on the inconsistencies concerning ancillary details. This is particularly true given that the prosecutor already had used Marcelino's prior inconsistent statement to impeach Marcelino's testimony that he did not recall the victim telling him that he had been shot by the petitioner. Therefore, we agree with the habeas court that the petitioner failed to prove that McMahon performed deficiently in failing to impeach Marcelino as to every inconsistency in his statements and testimony. Furthermore, as noted by the habeas court, the petitioner cannot demonstrate that he was prejudiced by McMahon's failure to cross-examine Marcelino on the specific issues because Marcelino did not testify at the habeas trial. See *Jones* v. *Commissioner of Correction*, supra, 212 Conn. App. 131–32.

Finally, regarding Santa, the petitioner argues that McMahon should have confronted Santa "with her completely opposite pretrial statement to [Kalinowski], provided mere weeks before the trial, admitting that she had been downstairs, not upstairs, and had *not* seen [the petitioner] shoot [the victim]." (Emphasis in original.) He claims that the court's finding that Santa testified at the criminal trial that she did not see the shooting is clearly erroneous and, therefore, that the court improperly dismissed the significance of impeaching Santa with her statement to Kalinowski. We disagree.

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing

court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Thomas* v. *Cleary*, 229 Conn. App. 15, 27–28, 326 A.3d 1109 (2024).

At the 2014 trial, on direct examination, Santa testified that she "heard a shooting" while she was in her aunt's house, which was across the street from where the Three Kings Day party was being held, which prompted her to go outside on a porch on the second story of the building to see what happened. She testified that, once outside on the porch, she saw "Mario, Yair, and [the petitioner]." When asked whether the petitioner was "doing anything with regard to [the victim]," she responded that she did not remember. The prosecutor then asked whether she saw the petitioner shoot the victim, and she said, "Yeah."

On cross-examination, Santa testified that she was inside the kitchen at her aunt's house when she heard a single gunshot, which prompted her to go outside on the porch. She further testified that it took "[l]ike a minute" for her to get from the kitchen to the porch to see what was happening outside. Accordingly, although Santa testified that she saw the petitioner shoot the victim, she also testified that she heard only a single gunshot while she was inside her aunt's kitchen and, thus, did not see the actual shooting. The habeas court emphasized that portion of Santa's testimony, noting that she went outside "*after* she heard one shot." (Emphasis in original.) Thus, the court's finding is not clearly erroneous because there is evidence in the record to support it, and we are not left with a definite and firm conviction that a mistake has been committed.

We further conclude that the court properly dismissed the significance of Santa's prior allegedly inconsistent statement to Kalinowski. In an entry dated

March 8, 2014, Kalinowski noted that, when she interviewed Santa, Santa stated that "[w]hat she recalls is that she was upstairs at her cousin's house when she heard gun shots. She said she ran [downstairs] and looked outside to see Mario and [the petitioner] at the scene. She told [Kalinowski that] she did not see the shooting take place, only that [the petitioner] and Mario both had guns and were fleeing the scene in Mario's car. . . . When [Kalinowski] asked her if maybe she mistook [the petitioner] for Mario because they are very similar in looks, she said 'No, they were both there.' " Kalinowski thus "did not feel a statement from [Santa] would be beneficial to the [petitioner]." Because Santa, like Marcelino, consistently maintained that she saw the petitioner on the night of the shooting in all of her statements, the court reasonably concluded that cross-examining her regarding the inconsistency as to where she was standing when she saw the petitioner on the night of the shooting "would have only served to reinforce her trial testimony that she did not see the shooting but did see [the petitioner] at the scene." Consequently, the petitioner's ineffective assistance claim predicated on McMahon's failure to confront Santa with her prior inconsistent statement also fails.

3

Last, the petitioner claims that the court improperly concluded that McMahon's failure to move to preclude the presentation to the jury of the 2004 conviction did not prejudice the petitioner. The petitioner's claim necessarily fails because he has failed to challenge the court's conclusion that McMahon did not perform deficiently regarding the evidence of the petitioner's 2004 conviction.

In its memorandum of decision, the habeas court summarily rejected the petitioner's ineffective assistance claim predicated on McMahon's failure to avoid

the introduction of the petitioner's 2004 conviction. The court reasoned that the petitioner "was charged with—and acquitted of—criminal possession of a firearm. One element of that offense is that the individual has a prior felony conviction. In order to avoid testimony on the subject, [McMahon] agreed to submit a stipulation to the jury that [the petitioner] . . . previously [was] convicted of an unnamed felony. The court fails to see how there could be any deficient performance. Nor is there any prejudice, since [the petitioner] was acquitted of the charge."

On appeal, the petitioner argues that "informing a [jury] of a [defendant's] prior conviction is highly prejudicial. Here, it was not just introduced, e.g., for credibility purposes, or to prove that he was a felon in possession. It was emphatically argued as evidence of guilt as the shooter. And though the jury rejected that count, it did convict on conspiracy, leading to the reasonable inference that [the petitioner] was viewed by the jury as a person of 'bad general character,' with a 'general readiness to do evil.' . . . Use of the prior conviction, compounded by the lack of any defense or confrontation, was enough to leave the jury feeling they should convict him of 'something.' "

The petitioner, however, fails to address the court's conclusion that McMahon did not perform deficiently by stipulating to the existence of the prior unnamed felony conviction. See *Soyini* v. *Commissioner of Correction*, 222 Conn. App. 428, 441, 305 A.3d 662 (2023) ("*Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong" (internal quotation marks omitted)), cert. denied, 348 Conn. 940, 307 A.3d 274 (2024). Given that a prior felony conviction is a necessary element of a criminal possession of a firearm charge; see General Statutes § 53a-217 (a) (1) (A) ("[a] person is guilty of criminal possession of a firearm . . . when such person possesses a firearm

. . . and . . . has been convicted of . . . a felony"); we agree with the habeas court that McMahon's decision to stipulate to the existence of an unnamed felony conviction to avoid having the state introduce evidence to establish that fact is not objectively unreasonable. See, e.g., *State* v. *Thompson*, 81 Conn. App. 264, 287, 839 A.2d 622 ("[a]lthough the stipulation may have been disadvantageous to the defendant, it was an element that necessarily had to be proven under § 53a-217"), cert. denied, 268 Conn. 915, 847 A.2d 312 (2004).

Furthermore, considering that the trial court instructed the jury that the stipulation had been admitted for the sole purpose of proving an essential element of the criminal possession of a firearm offense[14] and that the jury acquitted the petitioner of not only that charge but also of criminal attempt to commit murder and assault in the first degree,[15] the evidence presented at the habeas trial does not support the inference that the jury viewed the petitioner as a bad person with a propensity

[14] The court instructed the jury that the stipulation was "admitted [f]or a limited purpose, that purpose being to establish the second essential element of [the criminal possession of a firearm] offense. The stipulation may not be used for any other purpose."

[15] In his direct appeal, this court rejected the petitioner's claim that the jury's verdict finding him guilty of conspiracy to commit murder was inconsistent with his acquittal on the substantive charges. See *State* v. *Balbuena*, supra, 168 Conn. App. 206. We reasoned that "[t]he crime of conspiracy to commit murder requires that the [petitioner] agree to commit murder, perform an overt act in furtherance of committing murder, and hold the requisite intent to commit murder. . . . A jury reasonably could have found that the [petitioner] agreed to and held the requisite specific intent to kill the victim based on his active participation in a group that collectively made threatening comments to the victim, brandished weapons, pursued the victim, and shot at the victim. Proof of the substantive crimes, on the other hand, required the jury to find, inter alia, that the [petitioner] himself had performed an action or omission constituting a substantial step toward causing the victim's death . . . [and] had caused injury to the victim . . . or had possessed a firearm. . . . None of these is an element of the crime of conspiracy to commit murder, and therefore, the jury's verdict was not inconsistent with its conclusion that the defendant was guilty of conspiracy to commit murder." (Citations omitted.) Id., 206–207.

to do evil. "In the absence of an indication to the contrary, we presume that the jury followed the court's instructions and considered [the] evidence solely for the purpose for which it was admitted." (Internal quotation marks omitted.) *State* v. *Delacruz-Gomez*, 350 Conn. 19, 34, 323 A.3d 308 (2024); see also *State* v. *Patterson*, 344 Conn. 281, 301, 278 A.3d 1044 (2022) ("limiting instructions serve to minimize any prejudicial effect that [such] evidence . . . otherwise may have had" (internal quotation marks omitted)). Accordingly, we also agree with the habeas court that the petitioner failed to establish that he was prejudiced by McMahon's alleged ineffectiveness regarding the stipulation as to the petitioner's prior conviction.

The judgments are affirmed.

In this opinion the other judges concurred.

————————————